IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMIE MEZA,                          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      No. 13 C 1175
                                     )
CAROLYN W. COLVIN, Acting            )      Magistrate Judge Finnegan
Commissioner of Social Security,     )
                                     )
            Defendant.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff Jaime Meza seeks to overturn the final decision of the Commissioner of

Social Security ("Commissioner") denying his application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the

Social Security Act.  42 U.S.C. §§ 416, 423(d), 1381a.  The parties consented to the

jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and

filed cross-motions for summary judgment.  After careful review of the record, the Court

now denies the Commissioner's motion, and grants Plaintiff's motion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on October 20, 2009, alleging that he became

disabled on April 15, 2008.  (R. 116, 123).  His date last insured was September 30,

2009.  (R. 19).  His stated medical conditions included type 2 diabetes, high cholesterol,

blood in his urine, and waist pain.  (R. 141).  The Social Security Administration ("SSA")

denied the applications initially on January 12, 2010, and again on reconsideration on

April 22, 2010.  (R. 46-49).  Pursuant to Plaintiff's timely request, Administrative Law

Judge ("ALJ") Patricia A. Bucci held an administrative hearing on April 29, 2011.  (R.

30).   The ALJ heard testimony from Plaintiff, who appeared with counsel, and from vocational expert ("VE") Glee Ann L. Kehr.

On May 23, 2011, the ALJ found that Plaintiff remains capable of performing his past relevant work as a machine operator and, thus, is not disabled.  (R. 16-26).  The Appeals Council denied Plaintiff's request for review on August 3, 2012, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  (R. 10-12).  In support of his motion, Plaintiff argues that the ALJ erred (1) in assessing his RFC by rejecting the opinions of certain physicians that he was disabled and instead adopting a contrary opinion that he was capable of medium work; and (2) finding him incredible by (a) mischaracterizing the evidence supporting his allegations of fatigue and difficulty standing and walking, and (b) making an unreasonable inference based on his non-compliance with his treatment regimen.

## FACTUAL BACKGROUND

Plaintiff was born on January 18, 1957, was 54 years old, and was living with his spouse at the time of the ALJ's decision.  (R. 34-35; 116).  He had worked as a machine operator for over 30 years until April 15, 2008, when he stopped working due to pain in his feet, an inability to pick up parts at work, and eyesight problems.  (R. 34; 37-38; 40; 142).  Plaintiff also cannot read or write in English.  (R. 38).

**A.  Medical History**

**1.  2008-2009**

Plaintiff's earliest medical records are from his initial visit at PrimeCare Community Health ("PrimeCare") on August 16, 2008, where he was examined by a nurse practitioner, Celine Boers, APN/CNP.  (R. 255).  He stated he had been

diagnosed with type 2 diabetes about "one or two years" prior to this visit, had a history of high cholesterol, and had been smoking cigarettes for about thirty years. (R. 230; 255). Plaintiff told Nurse Boers that his son was recently murdered, and since his son's murder he had experienced: difficulty taking deep breaths, especially at night; increased fatigue; headaches and lightheadedness; nausea; and excessive sweating. (R. 255). Nurse Boers examined Plaintiff's feet and found his reflexes were intact, but there was a loss of protective sensation. (R. 227). Nurse Boers recommended a variety of tests, including a complete metabolic panel that showed Plaintiff had high sugar levels, and a hemoglobin test that showed a high HbA1c.[1] (R. 243-44). Plaintiff was prescribed aspirin for pain; metformin to treat diabetes; enalapril to treat high blood pressure; and lovastatin for high cholesterol.[2] (R. 255).

Plaintiff returned to PrimeCare for follow-up appointments and blood, urine and lipids testing in December 2008, and in January and February 2009. (R. 238-42; 253-54). On one occasion, Plaintiff's tests were delayed because he reported not taking his medications, but later test results showed Plaintiff had high sugar, triglycerides[3] and

---

1   HbA1c reflects the "accumulation of advanced glycation end products in haemoglobin, noted in patients with poorly controlled diabetes mellitus." http://medical-dictionary.thefreedictionary.com/HbA1c (last visited May 6, 2014).

2   Nurse Boers' notes indicate the medications prescribed to Plaintiff, but not why. Throughout this opinion, if the treater did not specifically indicate why certain medications were prescribed to Plaintiff, the Court consulted the medical dictionary at http://medical-dictionary.thefreedictionary.com to determine what conditions the medications are generally prescribed for.

3   "Triglycerides" are "[f]atty compounds synthesized from carbohydrates during the process of digestion and stored in the body's adipose (fat) tissues. High levels of triglycerides in the blood are associated with insulin resistance. http://medical-dictionary.thefreedictionary.com/Triglycerides (last visited May 6, 2014).

lipase[4] levels despite taking his medications as prescribed. (*Id.*). As a result, Plaintiff's metformin prescription was increased and he was prescribed Niaspan to treat the high triglyceride/lipase levels. (R. 253-54). On February 16, 2009, Nurse Boers wrote a "To Whom It May Concern" letter with a summary of her medical concerns about Plaintiff, including that his diabetes was "severely uncontrolled" when she initially evaluated him in August 2008. (R. 194). Although with treatment he was "gradually improving," his blood sugar levels were still not meeting her goal range for him of about 100 mg/dL. (*Id.*).

Plaintiff returned to PrimeCare for another follow-up with Nurse Boers several months later, on July 1, 2009, and reported he was taking his medications as prescribed. (R. 252-53). However, due to Plaintiff's abnormal testing results, including high cholesterol levels, his metformin and lovastatin prescriptions were doubled and he was given samples of Advicor (a once-daily proprietary combination of niacin and lovastatin, used to treat high cholesterol) to take in conjunction with his other medications. (R. 172; 237; 252). Nurse Boers also examined Plaintiff and completed a "Physician's Report" for the Illinois Department of Human Resources, stating that: Plaintiff's "chief complaints" were type 2 diabetes and high cholesterol; he had good responses from his enalapril; but he had "inconsistent availability" of some of his other medications, including metformin and Niaspan. (R. 195-99). She reported no abnormal examination results, but did state that she thought Plaintiff's ability to bend, stoop and

---

4    "Lipase" is a "fat-splitting enzyme; any enzyme that catalyzes the splitting of fats into glycerol and fatty acids. Measurement of the serum lipase level is an important diagnostic test for acute and chronic pancreatitis."  http://medical-dictionary.thefreedictionary.com/lipase (last visited May 6, 2014).

climb were reduced up to 20% and that he could lift no more than 10 pounds at a time. (R. 196-99).

Over the next several months, Plaintiff's sugar and triglyceride levels remained high, and in September 2009 Plaintiff transitioned from oral medications to Lantus (a long-acting insulin) injections. (R. 236; 250; 252). About a month after these appointments, on October 20, 2009, Plaintiff applied for DIB and SSI. (R. 19; 116; 123). At follow-up appointments with Nurse Boers in December 2009, Plaintiff complained of back, leg, feet, arm, chest and stomach pain, increased fatigue, loss of appetite, dizziness and dry mouth. (R. 248-49). Plaintiff's wife reported that she was administering his insulin as directed, but that he was "resistant" to the injections and finger sticks. (Id.). Although testing showed Plaintiff's sugar levels (and triglycerides) remained high, he did not immediately increase his amount of insulin injections, despite his health professionals' recommendations. (R. 232-35; 248-49).

### 2. Late 2009 Examinations and Reports by BDDS Physicians

On December 16, 2009, Dr. Charles Carlton, a consultative examiner for the Bureau of Disability Determination Services ("BDDS"), examined and interviewed Plaintiff, and reviewed his August 16, 2008 PrimeCare medical records and lab results from January 23, 2009 through September 19, 2009. (R. 202). In his consultative examination report for BDDS, Dr. Carlton wrote that Plaintiff alleged he was disabled due to type 2 diabetes, high cholesterol, pain the waist and blood in the urine. (Id.). When Dr. Carlton asked Plaintiff about his limitations, Plaintiff stated that he could only walk for about one block and he experienced fatigue, leg and upper back pain when he walked too much; that he had to take his time climbing stairs; and that he could only lift

up to 20 pounds and his back pain increased when he attempted to lift heavier loads. (R. 202-03).

Dr. Carlton observed that Plaintiff was well-developed; had no difficulty with tasks involving fine and gross movement of the hands and fingers and normal grip strength in both hands; and was able to rise from sitting to standing and walk for more than 50 feet without assistance. (R. 203-06). But, Plaintiff also displayed a "rigid gait" and moderate difficulty with tandem walking; severe difficulty walking on his toes; an inability to walk on his heels or hop on one leg; some shortness of breath; and moderate difficulty with squatting and arising. (*Id.*). Plaintiff also exhibited several range of motion restrictions, including that his shoulder flexion and abduction were limited to 130/150 degrees; his bilateral knee flexion was limited to 130/150 degrees; he was unable to raise his arms over his head due to complaints of pain; his cervical spine extension limited to 20/60 degrees; his left and right lateral bending of the cervical spine were limited to 20/45 degrees; his left rotation of the cervical spine was limited to 60/80 degrees and his right rotation was limited to 70/80 degrees; and his lumbar spine flexion without hip flexion was limited to 50/60 degrees and with hip flexion was limited to 80/90 degrees. (R. 204-08).

Neurologically, Plaintiff had normal motor strength, sensation and reflexes except in the shoulders and feet. (R. 204). Specifically, Plaintiff described altered sensation to light touch in both feet, proprioception in both of his feet was impaired, and Plaintiff's participation in testing of his rotator cuff muscle group in each shoulder was limited due to pain.[5] (*Id.*). Based on the foregoing, Dr. Carlton's "conservative estimate of

_____

5  "Proprioception" means "The sense that deals with sensations of body position, posture, balance, and motion."  http://medical-dictionary.thefreedictionary.com/proprioception (last visited

[Plaintiff's] functional abilities" was that Plaintiff could walk greater than fifty feet without assistance; could safely lift, handle and carry up to 20 pounds from waist level to shoulder level using both hands; could safely sit and stand; but could not lift either arm over his head due to pain. (R. 205).

On December 31, 2009, Dr. Young-Ja Kim, a state agency reviewer, completed an RFC assessment for BDDS related to Plaintiff's claim for disability. (R. 215-22). Dr. Kim found that Plaintiff could occasionally lift and carry up to 50 pounds; frequently lift and carry up to 25 pounds; and stand, sit or walk for up to six hours in an eight hour workday. Dr. Kim also found that Plaintiff had the unlimited ability to push or pull; could frequently balance, stoop, kneel, crouch, crawl and reach overhead with both arms; and could occasionally climb ramps, stars, ladders, ropes and scaffolds. (R. 216-18). In support, Dr. Kim noted that Dr. Carlton's examination showed Plaintiff had no difficulty getting on and off the examination table; his ambulation was "normal" other than his rigid gait; he had normal motor strength, sensation and deep tendon reflexes; and he had only a "slight loss of motion" in the shoulders, back and knees. (R. 222). Dr. Kim rejected Nurse Boers' July 2009 assessment that Plaintiff could lift no more than 10 pounds at a time because Nurse Boers did not support the assessment with any abnormal findings from her physical examination of Plaintiff, and because Plaintiff himself stated to Dr. Carlton that he could lift up to 20 pounds. (R. 221-22).

### 3.    2010

Shortly after Dr. Kim's report, on January 12, 2010, the SSA denied Plaintiff's applications for DIB and SSI. (R. 46-49). Plaintiff returned to PrimeCare for follow-up visits with Nurse Boers in January, February, and March 2010. (R. 245-47). Plaintiff

May 6, 2014).

reported at times that he had not been checking his sugar levels due to problems with the blood lancets or because his machine was not working (although he was sometimes able to borrow his mother's machine, which showed his sugar levels were still high). (*Id.*). He also complained of a decreased appetite and energy, poor sleep and pain in his heels. (*Id.*). Nurse Boers thought that his heel pain symptoms were "atypical" for plantar fasciitis, but could be caused by neuropathy. (R. 245.). She also wrote that Plaintiff's lack of adherence to his diabetic treatments was resulting in poor control of his condition. (*Id.*). As a result, she recommended various treatments and follow-ups, but other than for one medication refill, the record does not contain any evidence that Plaintiff ever returned to PrimeCare. (*Id.*).

On April 20, 2010, Dr. Frank Jimenez, a non-examining state reviewer, reconsidered Dr. Kim's December 31, 2009 RFC assessment for BDDS and affirmed Dr. Kim's findings, stating that Plaintiff had no new allegations of worsening symptoms. (R. 256-63). He acknowledged that Plaintiff reported foot pain to Nurse Boers in February 2010, but found that she did not think it was caused by fasciitis or neuropathy (apparently misinterpreting Nurse Boers' note that Plaintiff's pain could be caused by neuropathy). (R. 263). Two days later, on April 22, 2010, the SSA affirmed its denial of Plaintiff's applications for DIB and SSI, on reconsideration. (R. 46-49).

Several months later, on October 15, 2010, Plaintiff began seeing Dr. Cesar Bastos, an internist at Mount Sinai Hospital ("Mount Sinai"). (R. 282-85). Based on Plaintiff's blood and hemoglobin testing results, which showed high blood glucose levels and a high HbA1c, Dr. Bastos diagnosed Plaintiff with uncontrolled diabetes and recommended that he stop taking metformin and enalapril, but raise his Lantus

injections to 60 units per day.  (R. 282-85; 291-93.).  Plaintiff also complained of severe leg pain, and Dr. Bastos noted Plaintiff had no sensation in his fifth toes.  (*Id.*).  Dr. Bastos referred Plaintiff for a bilateral lower extremity arterial Doppler with exercise examination ("Doppler examination")—which involved alternative periods of brisk walking and rest during which Plaintiff's right and left ankle-brachial indexes ("ABI")[6] would be measured.  (R. 285, 302-03).

Plaintiff had the Doppler examination done on October 29, 2010.  (R. 302-03).  Dr. Elizabeth T. Clark, a vascular surgeon who examined the results, opined that although Plaintiff limped during the examination and stated he experienced some pain, his ABIs were normal—ranging on the right from 1.33 to 1.07, and on the left from 1.22 to 0.99—and there was no evidence of aortoiliac occlusive disease.[7]  (*Id.*).

At follow-ups with Dr. Bastos in November and December 2010, Plaintiff complained of severe back pain, high sugar levels, and problems using his insulin injections device because it was "old" and hard to use.  (R. 279-80).  Dr. Bastos persisted in his diagnosis of uncontrolled diabetes and recommended that Plaintiff increase his Lantus injections as well as make diet and exercise changes.  (*Id.*).

### 4.    Early 2011 and February 2011 Hospitalization

At follow-ups with Dr. Bastos in January 2011, Plaintiff's sugar levels were still high and he had not been following Dr. Bastos' advice regarding his diet and Lantus

---

6   The "ankle-brachial index" or "ABI" is an "objective measurement of arterial insufficiency based on the ratio of ankle systolic pressure to brachial systolic pressure. An ABI of 1.0 indicates absence of arterial insufficiency; an ABI of less than 0.50 indicates severe arterial insufficiency."  http://medical-dictionary.thefreedictionary.com/ankle-brachial+index (last visited May 6, 2014).

7   "Aortoiliac occlusive disease" means "obstruction of the abdominal aorta and its main branches by atherosclerosis.  Also called Leriche's syndrome."  http://medical-dictionary.thefreedictionary.com/aortoiliac+occlusive+disease (last visited May 6, 2014).

injections. (R. 274-78). Dr. Bastos continued to recommend diet changes and Lantus injection increases. (*Id.*). On February 9, 2011, Plaintiff returned to see Dr. Bastos, complaining of high sugar levels and bilateral heel pain and leg weakness. (R. 272-74). Dr. Bastos again assessed Plaintiff with uncontrolled diabetes as well as polyneuropathy.[8] (*Id.*). He recommended Plaintiff increase his Lantus injections and referred Plaintiff to podiatrist Dr. Sloan V. Metz for an examination. (*Id.*).

At the initial consultation with Dr. Metz on February 10, 2011, Plaintiff complained of pain in both of his heels (that he had felt "on and off" for about three years) and leg weakness that caused his legs to "give out on him" whenever he walked for more than one block. (R. 324). Dr. Metz also examined Plaintiff and found the following: Plaintiff's pulses were intact bilaterally; his capillary refill time was less than 3 seconds for all of his toes on both feet;[9] neurologically he was intact (as determined from testing his foot with strands of nylon for loss of sensation); and he had no edema. (*Id.*). However, Dr. Metz also noted that Plaintiff had an antalgic gait with some instability in certain stances; pain on palpation; deep tendon reflexes and patellar tendon reflexes that were not intact; some minor muscle weakness in the lateral and anterior muscle groups; and Plaintiff's Doppler examination showed "abnormal ankle-brachial indices with exercise but normal with rest." (*Id.*). Dr. Metz recommended Plaintiff have a nerve conduction study ("NCS") done of his lower extremities to rule out any neuromuscular

---

8    "Polyneuropathy" means "neuropathy of several peripheral nerves simultaneously." http://medical-dictionary.thefreedictionary.com/Peripheral+Neuropathy (last visited May 6, 2014).

9    About 2 seconds is normal. http://medical-dictionary.thefreedictionary.com/capillary+refill+time (last visited May 6, 2014).

disease (which Plaintiff did in March 2011, as discussed below); wear supportive shoes; do stretching exercises; and use custom foot orthoses. (R. 324-25).

On February 21, 2011, Plaintiff visited Dr. Bastos and complained of chest pain, pain in his upper extremities, shortness of breath and palpitations. (R. 271). Dr. Bastos became concerned since Plaintiff also had an elevated heart rate, and recommended Plaintiff immediately be seen in the emergency department of the hospital. (*Id.*). The emergency department attending physician, Dr. Gaurav R. Shah, examined Plaintiff and admitted him to the hospital, and recommended various procedures, tests, and consultations with various specialists over the next few days. (R. 286-89; 297-301; 306-23). Ultimately, the specialists determined Plaintiff did not have any acute coronary syndrome, but he did have tuberculosis. (R. 286-87; 311; 323).

While Plaintiff was hospitalized, Dr. Shah also referred him for updated blood and hemoglobin tests and an endocrinology consultation with Dr. Paula Butler, due to concerns about his uncontrolled diabetes. (R. 317). At Plaintiff's February 22, 2011 endocrinology consultation and examination, Dr. Butler diagnosed Plaintiff with type 2 diabetes that was not well-controlled. (R. 317-19). She recommended he take a combination of long- and short-acting insulin—specifically, stop the Lantus injections and instead inject NovoLog (a rapid-acting insulin) at 75 units per day (with an injection of 50 units with breakfast and 25 units with dinner) while also taking Actos—and make changes in his diet. (R. 319). Dr. Butler also suggested more frequent injections each day and more frequent blood glucose monitoring, but Plaintiff told Dr. Butler that he was unwilling to do so. (*Id.*). The next day, on February 23, 2011, Plaintiff had his blood

and hemoglobin tested. (R. 288-89). His glucose and HbA1c level were high, and his level of albumin the blood was low.[10] (R. 288-89).

On February 25, 2011, Plaintiff was discharged from the hospital by Dr. Shah, who wrote a lengthy discharge summary that included portions of the reports of Dr. Butler and the other specialists who examined Plaintiff. (R. 305-311). Dr. Shah also examined Plaintiff at the time of discharge and wrote that he was not in any acute distress; his extraocular muscle[11] movements were intact; his pupils reacted normally; his lungs were clear; his heartbeat was regular and normal; he had no edema, cyanosis or clubbing in his extremities; he had a full range of muscle movements and normal muscle tone and strength in all four extremities; and his reflexes, speech and "higher functions" were intact. (R. 307-08). He had mild epigastric tenderness but no guarding or rigidity; and although he described suffering from chronic low back pain, heel pain, and tingling and numbness in the feet, he exhibited no spinal tenderness and his sensations were intact bilaterally. (*Id.*).

Dr. Shah wrote that Plaintiff's uncontrolled blood sugar levels as well as lipid panel results caused concern, which led to prescriptions for Novolog, simvastatin (a medication for treating hypercholesterolemia) and some consultations on his diet. (R. 308-10). The physicians had determined, however, that Plaintiff's sugars were "better controlled" and he had a diet plan. (R. 310). Plaintiff was discharged with instructions for various follow-ups, including with Dr. Bastos. (R. 310-11).

---

10      This can be a sign of kidney impairment. http://medical-dictionary.thefreedictionary.com/hypoalbuminemia (last visited May 6, 2014).

11  "Extraocular muscle" refers to "any of the six small muscles that control movement of the eyeball within the socket." http://medical-dictionary.thefreedictionary.com/extraocular+muscle (last visited May 6, 2014).

### 5. Post-Hospitalization Treatment

On March 2, 2011, Plaintiff followed-up with Dr. Bastos, at which time the doctor reviewed some of Plaintiff's recent tests results, including the February 23, 2011 blood test showing the low albumin levels and thus potential kidney issues, and his positive tuberculosis results. (R. 269-70; 286-88; 297-301; 314; 316; 319; 325). Dr. Bastos also reviewed certain reports by the specialists Plaintiff had consulted with, including Dr. Metz's February 10, 2011 report. (*Id.*). Plaintiff explained that Dr. Butler had prescribed him Novolog for his diabetes, but he had not started taking it. (R. 269-70). Dr. Bastos again persisted in his diagnosis of uncontrolled diabetes; added a diagnosis for pulmonary tuberculosis; and recommended that Plaintiff start his Novolog and report for the follow-ups with the hospital's specialists (but there are no reports in the record showing Plaintiff followed-up as requested). (*Id.*). Shortly thereafter, Plaintiff started taking Humalog,[12] and on March 8, 2011, after Plaintiff reported that his blood sugar levels had fallen, Dr. Bastos recommended Plaintiff increase his Humalog injections. (R. 270).

On March 18, 2011, Plaintiff had the NCS/EMG of his lower extremities done that had been recommended back on February 10, 2011 by Dr. Metz. (R. 294-95). Plaintiff reported to Dr. Mihaela Hangan, the neurologist who examined Plaintiff and evaluated the NCS/EMG results, that he had been experiencing burning pain in the soles and tingling and numbness in his feet for about a year; difficulty walking because of weak legs and pain from his hips that radiated toward his legs; and low back pain. (R. 294).

---

12 Humalog, like Novolog, is a rapid-acting insulin. http://www.rxlist.com/humalog-drug.htm (last visited May 6, 2014). Dr. Bulter's notes and Dr. Bastos' March 2, 2011 notes reflect Plaintiff was prescribed Novolog, but from March 8, 2011 after, Plaintiff is described as taking Humalog, not Novolog. There is no explanation in the record discussing why Plaintiff was taking Humalog rather than Novolog.

Dr. Hangan found Plaintiff had normal strength but decreased sensation to light touch, pin prick and vibration, as well as decreased proprioception below the knees. (*Id*.). The NCS/EMG showed prolonged peak latencies in Plaintiff's sural nerves;[13] slowed conduction velocity of the left tibial motor response; slowed motor response and a prolonged distal latency in the left common peroneal;[14] and mildly prolonged latencies in all F-waves.[15] (R. 295). Dr. Hangan opined that the NCS/EMG results showed evidence of mild demyelinating sensory peripheral polyneuropathy of both lower extremities. (R. 295).

Ten days later, on March 28, 2011, Plaintiff saw Dr. Bastos for a follow-up, at which time the doctor reviewed the results from Plaintiff's NCS/EMG, including Dr. Hangan's report. (R. 268, 294-96). Plaintiff reported injecting 90 units of Humalog per day as recommended and that his "baseline" leg numbness and pain had "mildly worsened." (R. 268). Dr. Bastos assessed Plaintiff with uncontrolled diabetes and pulmonary tuberculosis; recommended he increase his Humalog injections to 100 units per day; and told Plaintiff to follow-up again in two weeks. (*Id*.).

---

13  "Sural nerves" are located in the "skin on back of leg, and skin and joints on lateral side of heel and foot." http://medical-dictionary.thefreedictionary.com/nerve (last visited May 6, 2014).

14  "Common peroneal" refers to "a nerve originating from the sciatic nerve that gives origin to two cutaneous branches, the sural communicating nerve, which contributes to the innervation of the skin over the lower posterolateral side of the leg, and the lateral sural cutaneous nerve, which innervates the skin over the upper lateral leg. It then continues around the neck of the fibula and enters the lateral compartment, where it divides into the superficial fibular nerve and the deep fibular nerve. The superficial fibular nerve innervates the fibularis longus and brevis and some of the dorsal areas of the foot and toes. The deep fibular nerve innervates the anterior compartment of the leg." http://medical-dictionary.thefreedictionary.com/common+peroneal (last visited May 6, 2014).

15  "In neuroscience, an F wave is the second of two voltage changes observed after electrical stimulation is applied to the skin surface above the distal region of a nerve. F waves are often used to measure nerve conduction velocity, and are particularly useful for evaluating conduction problems in the proximal region of nerves (i.e., portions of nerves near the spinal cord)." http://encyclopedia.thefreedictionary.com/F+wave (last visited May 6, 2014).

At the request of Plaintiff's attorney, Dr. Bastos also filled out a medical questionnaire to support Plaintiff's DIB and SSI claims. (R. 265-67). In response to the numbered questions on the form, Dr. Bastos stated that Plaintiff had uncontrolled type 2 diabetes mellitus (insulin dependent) with nephropathy[16] and polyneuropathy; active pulmonary tuberculosis; and his symptoms included pain and numbness in his lower extremities. (R. 265). Plaintiff's treatment consisted of anti-diabetic and anti-tuberculosis medications and the doctor anticipated Plaintiff would continue medical treatments and medications in the future. (R. 266). In terms of Plaintiff's prognosis, Dr. Bastos wrote that it was "fair" as Plaintiff had a limited tolerance for activities due to his pain and a higher risk of damage to his lower extremities due to numbness. (R. 265-66). Dr. Bastos indicated that Plaintiff was not capable of performing a full-time job because of his pain and increased risk for injuries. (R. 266). There is no further medical documentation after this date.

## B.    Plaintiff's Testimony

At the April 29, 2011 hearing before the ALJ, Plaintiff testified that he stopped working on April 15, 2008 because his feet and waistline hurt, causing him to be unable to walk, and he was unable to use his (dominant) right hand to "grab" anymore. (R. 34-35). He testified that his pain in his hand was caused by a 1982 operation which "damaged" a portion of his hand and gradually resulted in increased pain and reduced strength in that hand. (R. 35, 37-38). Although he took medication for pain, it helped "very little." He watched his diet and took diabetes medication, but his sugar levels

---

16 "Nephropathy" is "disease of the kidneys." http://medical-dictionary.thefreedictionary.com/nephropathy (last visited May 6, 2014).

were at times uncontrolled (reaching as high as 500 mg/dL), which caused his vision to blur.  (R. 35-36, 39).

He testified that he did "nothing" all day but instead sat or lied down to relieve his pain; did nothing outside the house; did no cooking or housework; did not drive; and was limited to "slowly" buttoning or zipping his clothes when dressing.  (R. 35-37).  He further testified that he was able to lift about five pounds, using both hands; could walk about half a block and then needs a resting break; struggles with standing; felt "sad" and forgetful; had "very low" energy with no desire to do anything; and had been feeling this way since 2007.  (R. 36-39).

## C.    Vocational Expert Testimony

Glee Ann L. Kehr testified at the hearing as a vocational expert ("VE"). Regarding Plaintiff's past work, Kehr testified that Plaintiff's past positions were classified as a machine operator (medium, unskilled work), performed as lifting between light and medium.  (R. 41).  The ALJ asked Kehr to consider a hypothetical person of Plaintiff's age, education level and work experience who can:  perform medium work; occasionally lift and carry up to 50 pounds; frequently lift and carry 25 pounds; stand or walk six hours in an eight hour day; sit for a total of six hours in an eight hour day; push or pull an unlimited amount; occasionally climb, frequently balance, stoop, kneel, crouch and crawl; and who is limited to frequent overhead reaching with both arms.  (R. 41-42). The VE testified that such a person could perform Plaintiff's past work as it is generally performed.  (R. 42).  If the same person was unable to lift more than 20 pounds, the VE testified that such a person could not perform Plaintiff's past work because the person would be limited to light work.  (*Id*.).  If the person could lift between 20 or 25 pounds,

the VE testified that such a person might or might not be able to perform Plaintiff's past work. (R. 43).

In response to Plaintiff's attorney's questioning, the VE testified that the same individual described in the ALJ's hypothetical who would be off task for ten percent of the day would still be able to do Plaintiff's past work, but a person who was off task for more than ten percent of the day would not. (R. 43). Also, if the person were unable to stand for at least five hours a day, the person could not perform Plaintiff's past work. (*Id.*).

**D.    The ALJ's Decision**

The ALJ found that Plaintiff's diabetes and high cholesterol were severe impairments, but that neither of these impairments met or equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22). The ALJ further found that Plaintiff had the following non-severe impairments: surgery performed in 1982 on the right third finger; tuberculosis; and complaints of neuropathy with heel pain. (*Id.*). The ALJ found Plaintiff's surgery on the right third finger was non-severe because he never received any further treatment for that condition; his tuberculosis was non-severe because there was no evidence that it would minimally restrict Plaintiff's ability to engage in work-related activities for 12 continuous months; and the complaints of neuropathy with heel pain were non-severe because there was no evidence of fasciitis and no treatment showing the alleged impairment would last 12 continuous months. (*Id.*).

The ALJ further found that Plaintiff is capable of performing medium work, including occasionally lifting or carrying 50 pounds; frequently lifting or carrying 25

pounds; and sitting, standing or walking for up to 6 hours in an 8 hour day; but was limited to frequent overhead reaching with both arms. (R. 23-26). The ALJ accepted the VE's assessment that Plaintiff's past work as a machine operator was medium (and unskilled) work, and thus found that he remains capable of performing that work. (R. 26). In reaching this conclusion, the ALJ rejected Dr. Carlton's opinion that Plaintiff is limited to lifting up to 20 pounds from waist level to shoulder level, finding the opinion was inconsistent with the doctor's own examination findings and the medical record as a whole, and was instead largely based on Plaintiff's statements regarding his assessment of his ability to lift weight. (R. 25). The ALJ also rejected Dr. Bastos' opinion that Plaintiff was incapable of working full-time, as vague, conclusory, sympathetic, and inconsistent with the objective medical evidence. (*Id.*). The ALJ further found that Dr. Bastos did not support his opinion using any function-by-function analysis and that it was an opinion on an issue reserved to the Commissioner. (*Id.*).

Instead, the ALJ adopted the opinion of Dr. Jimenez that Plaintiff was capable of medium work, finding that opinion was consistent with the medical evidence, the clinical findings, the medical history, and the observations of Plaintiff's treating and examining physicians. (R. 23). The ALJ also found that Plaintiff's credibility regarding his pain and limitations was diminished because he appeared to be exaggerating the limitations and restrictions imposed by his impairments. Specifically, his complaints regarding his fatigue were vague, his allegations of difficulty standing and walking were not supported by medical evidence, and he was non-compliant with his diabetes and high cholesterol treatment regime, showing he was being disingenuous about the severity of his pain and impairments. (R. 23-25).

## **DISCUSSION**

### A. **Standard of Review**

Judicial review of the ALJ's decision, which constitutes the Commissioner's final decision, is authorized by Section 405(g) of the Social Security Act. 42 U.S.C. § 405(g). That decision will be upheld "so long as it is supported by 'substantial evidence' and the ALJ built an 'accurate and logical bridge' between the evidence and her conclusion. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir.2009)). An ALJ need not mention every piece of evidence in her opinion, as long as she does not ignore an entire line of evidence that is contrary to her conclusion. *Id*. (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir.2012)). Although the Court will not reweigh the evidence or substitute its judgment for that of the ALJ, a decision that "lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir.2014); *see also id.* (the ALJ's articulated reasoning must be sufficient to allow the reviewing court to assess the validity of the agency's findings and afford a claimant meaningful judicial review).

### B. **Five-Step Inquiry**

To qualify for SSI under Title XVI of the Social Security Act or DIB under Title II of the Social Security Act, a claimant must establish that she suffers from a "disability" as defined by the Act and regulations. *Infusino v. Colvin,* 12 CV 3852, 2014 WL 266205, at *7 (N.D. Ill. Jan. 23, 2014); *Gravina v. Astrue*, 10-CV-6753, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012). A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423 (d)(1)(A), 1382c(a)(3); *Infusino,* 2014 WL 266205, at *7; *Gravina*, 2012 WL 3006470, at *3.  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Simila*, 573 F.3d at 512-13 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)).

Additionally, to qualify for DIB, a claimant is required to show that she was disabled before her date last insured.  *Givens v. Colvin*, — Fed. Appx. —, 2013 WL 6623179, at *1 n.1 (7th Cir. Dec. 17, 2013) (*citing Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir.2012); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005)); *see also Hoyt v. Colvin,* — Fed. Appx. —, 2014 WL 444161, at *1 n.1 (7th Cir. Feb. 5, 2014) (same).  To qualify for SSI, however, a claimant need only show she is presently disabled and of limited means.  *Givens*, 2013 WL 6623179, at *1 n.1 (*citing* 42 U.S.C. §§ 1381a, 1382; *Sienkiewicz*, 409 F.3d at 802; *Steed v. Astrue*, 524 F.3d 872, 874 n. 2 (8th Cir.2008)); *see also Hoyt*, 2014 WL 6623179, at *1 n.1 (same).

**C.    Analysis**

The Court now addresses in turn each of Plaintiff's arguments challenging the ALJ's decision.

### 1.     Physician Opinion Evidence

Plaintiff argues the ALJ erred in determining his RFC based on her improper consideration of three physicians' opinions—Dr. Charles Carlton, Dr. Cesar Bastos and Dr. Frank Jimenez.  (Doc. 17, at 7-12; Doc. 20, at 1-4).  Plaintiff contends that if the ALJ had properly considered these opinions, she would have limited him to light work or less.  As a result, because he is also unable to communicate in English, has only unskilled work experience, and was approaching advanced age, he would have been deemed disabled under grid rule 202.09.  (Doc. 17, at 7 (citing 20 C.F.R. Part 404, Subpart P, App. 2, Rule 202.09.)).

### a.     Dr. Carlton's Opinion on Plaintiff's Lifting Limit

Plaintiff argues that the ALJ erred by giving little weight to the opinion of a consultative examining physician, Dr. Carlton, that he could only lift up to 20 pounds. (Doc. 17, at 8-9; Doc. 20, at 1-2).  An ALJ is not required to assign the opinion of a non-treating source controlling weight, but instead shall determine the weight the opinion deserves by examining how well the source supported and explained his opinion, whether his opinion is consistent with the record, and "any other factor of which the ALJ is aware."  *Simila v. Astrue*, 573 F.3d 503, 514-15 (7th Cir. 2009).  That is what the ALJ did here, and her determination is supported by substantial evidence.

The ALJ first explained that she found Dr. Carlton's opinion was not entitled to significant weight because it was not consistent with his examination findings.  (R. 25). The ALJ discussed that Dr. Carlton's December 2009 examination showed that Plaintiff had normal grip strength and fine and gross motor skills in each hand, and his neurological examination showed normal motor strength and reflexes.  (R. 24).

Although there were some "minimal findings" of limitations, including that Plaintiff exhibited some difficulty reaching overhead with his arms, the ALJ determined that these findings were only supportive of a restriction for "frequent overhead reaching." (R. 24-25).

The ALJ also explained that she was discounting the weight of Dr. Carlton's opinion because it was not supported by the record as a whole. She observed that Plaintiff's other examinations had been "largely unremarkable," and specifically discussed that Nurse Boers' July 1, 2009 examination findings were "benign" and Dr. Shah's February 23, 2011 musculoskeletal examination showed that Plaintiff had a full and normal range of motion in the upper extremities and in all joints. (R. 24-25).

Finally, the ALJ noted that Dr. Carlton's opinion should be discounted because it appeared to be based largely on Plaintiff's own statement that he could only lift up to 20 pounds because his back pain worsens when he tries to lift heavier loads. (*Id.*). "An ALJ may give less weight to an opinion that appears to rely heavily on the claimant's subjective complaints, even if the source of that opinion had examined the claimant." *Givens*, 2013 WL 6623179, at *6 (citing 20 C.F.R. § 404.1527(c)(3); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)). In light of the medical evidence cited above, the ALJ reasonably concluded that Dr. Carlton's 20 pound lifting restriction was based on Plaintiff's subjective complaints. Thus, the ALJ articulated three sound reasons for discounting Dr. Carlton's opinion—his examination findings did not support it, the medical evidence of record did not support it, and it appeared to be based largely

on Plaintiff's own assessment of his ability to lift and carry weight—each of which is supported by substantial evidence.

Plaintiff argues that Dr. Carlton's lifting limitation was consistent with his examination findings of a decreased range of motion in the shoulders, lumbar and cervical spine, and his inability to reach overhead with his arms. But this Court may not "displace the ALJ's judgment by reconsidering facts or evidence," but instead must determine whether the ALJ supported her decision by substantial evidence and built an accurate and logical bridge from that evidence to her conclusion. *Simila*, 573 F.3d at 513. The ALJ met that standard here. The ALJ considered Dr. Carlton's examination report and noted there were findings supportive of his ability to lift weight, including normal grip strength and motor strength. However, there were minimal findings of certain motion restrictions, including, as Plaintiff points out, the inability to flex and bend his shoulders greater than 130 degrees and certain limitations in bending and flexing his spine. The ALJ determined that these findings supported assessing Plaintiff with a range of motion restriction (to accommodate his difficulty lifting his arms above his head) but not a weight-lifting restriction. This is neither illogical nor unsupported. Drs. Kim and Jimenez, considering the same evidence, came to the same conclusion. (R. 222; 263). In fact, no physician other than Dr. Carlton found Plaintiff's ability to lift and carry weight to be limited to less than 25 pounds.[17]

For similar reasons, Plaintiff's argument that the ALJ did not reasonably infer that Dr. Carlton's opinion was largely based on Plaintiff's own statement to him that he was limited to lifting 20 pounds, is also meritless. Although Dr. Carlton stated at the end of

---

[17] Nurse Boers found Plaintiff to be limited to lifting 10 pounds or less, but the ALJ rejected that opinion as unsupported and because Nurse Boers is not an acceptable medical source; Plaintiff does not challenge that assessment. (R. 25).

his report that his assessment of Plaintiff was based on "a time limited history, physical examination and review of medical records," as the ALJ explained, neither the examination findings nor the medical evidence of record supported Dr. Carlton's finding regarding the 20 pound lifting limitation. Instead, the limitation appeared to be based on Plaintiff's own description of his lifting tolerance, which it mirrored. The fact that the only evidence Plaintiff cites from the record as consistent with Dr. Carlton's opinion is his own statement further supports that the ALJ reasonably inferred the opinion was largely based on that statement. (Doc. 17, at 8).

Plaintiff also argues that the ALJ erred by weighing the opinion of a non-examining source, Dr. Jimenez, over Dr. Carlton's opinion. Quoting case law holding that an ALJ may not reject an examining physician's opinion based solely on the contradictory opinion of a non-examining physician, Plaintiff appears to argue that the ALJ relied on Dr. Jimenez's opinion to discount the weight of Dr. Carlton's opinion. (Doc. 17, at 9) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)). However, the ALJ did not cite Dr. Jimenez's contrary opinion as one of her reasons for giving little weight to Dr. Carlton's opinion. (R. 25). Instead, as discussed above, the ALJ stated that she was not giving significant weight to Dr. Carlton's opinion based on its inconsistency, lack of support, and because it was largely based on Plaintiff's own assessment of his ability to lift weight. (*Id.*). Thus, the ALJ weighed Dr. Carlton's opinion based on the factors required under the regulations, and did not err in that assessment even though she ultimately gave greater weight to the opinion of a non-examining physician. *See Givens*, 2013 WL 6623179, at *6 (rejecting argument that ALJ erred giving greater weight to opinion of non-examining physician than examining

physician's opinion because ALJ explicitly discounted examining physician's opinion based on its inconsistency with MRIs and because it relied heavily on claimant's subjective complaints).

Finally, Plaintiff's argument that the ALJ should have contacted Dr. Carlton to clarify how he arrived at his opinion regarding how much weight Plaintiff could lift is also meritless. "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(e)). Here, the ALJ had Dr. Carlton's report, which set forth his review of Plaintiff's medical history, including his interview of Plaintiff, his examination results and his medical source statement; the treatment records and lab reports Dr. Carlton stated he reviewed; the results of Plaintiff's diagnostic tests; and reports from other sources, including from several specialists who examined Plaintiff. The record was adequately developed, and "[t]his was not a case in which the basis of the medical opinions required explication." *Masek v. Astrue*, No. 08 C 1277, 2010 WL 1050293, at *17 (N.D. Ill. Mar. 22, 2010). The ALJ provided sound reasons for giving little weight to Dr. Carlton's opinion that Plaintiff could not lift more than 20 pounds, and did not err by failing to seek further information from him regarding the basis for his opinion. For all of these reasons, the ALJ's assessment of the weight to accord Dr. Carlton's opinion was supported by substantial evidence and does not require reversal.

### b.    Dr. Bastos' Opinion on Plaintiff's Inability to Work

Next, Plaintiff argues that the ALJ erred in rejecting the March 28, 2011 opinion of his treating physician, Dr. Cesar Bastos, that he was unable to work full-time because

his conditions caused pain and increased risk for injuries due to numbness in his lower extremities. Plaintiff concedes that the ALJ correctly determined this opinion is not entitled to controlling weight because the final determination of disability is reserved to the Commissioner. (Doc. 17, at 11). *See also* 20 C.F.R. § 404.1527(d); *Bjornson v. Astrue*, 671 F.3d 640, 647–48 (7th Cir. 2012) (Commissioner shall not give any special significance to statement by medical source that claimant cannot work); *Dampeer v. Astrue*, 826 F.Supp.2d 1073, 1082 (N.D. Ill. 2011) ("[W]hether Claimant is 'disabled' is an administrative finding reserved for the Commissioner rather than a medical opinion."). That said, the ALJ still needed to decide what weight to give Dr. Bastos' opinion considering the factors outlined in the applicable regulations, including "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (quoting *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)).

Regarding Dr. Bastos' March 28, 2011 assessment, the ALJ first wrote that there was no evidence in the record that Dr. Bastos ever treated the Plaintiff. (R. 25). As Plaintiff points out, this was an error; Dr. Bastos treated Plaintiff eight times between October 15, 2010 and March 28, 2011. (Doc. 17, at 10). The Commissioner concedes that the ALJ erred, but argues that reversal is not required because the ALJ nevertheless properly concluded that Dr. Bastos' opinion was vague, conclusory and inconsistent with the medical evidence in the record, and properly rejected Dr. Bastos' opinion in favor of Dr. Jimenez' opinion. (Doc. 19, at 4-5). However, the Court is not confident that the ALJ properly considered Dr. Bastos' opinion, particularly given the

Commissioner's admission that the ALJ did not consider any notes or reports from Dr. Bastos' treatment records.

In support of the ALJ's finding that Dr. Bastos' opinion was inconsistent with the medical evidence, the ALJ wrote that the record did not support the impairments that Dr. Bastos' attributed to Plaintiff's uncontrolled diabetes with nephropathy and polyneuropathy. (R. 25). First, according to the ALJ, the record contained no evidence of any nephropathy or kidney problems.[18] (*Id.*) However, Dr. Bastos' notes show that he examined several diagnostic tests and reports regarding Plaintiff, including test results showing Plaintiff had abnormally low levels of albumin in the blood, which can be a sign of kidney problems. (R. 269; 289). The ALJ was required to consider the tests Dr. Bastos relied upon and the supportability of his opinion in determining the weight to accord his opinion, but she did not do so when discounting the doctor's opinion for lack of evidence of nephropathy or kidney problems.

The ALJ also rejected Dr. Bastos' assessment of work limitations imposed by Plaintiff's polyneuropathy because his March 28, 2011 NCS/EMG showed only "mild polyneuropathy" that would not significantly limit Plaintiff's ability to stand or walk. (R. 24-25). However, Dr. Metz (a podiatrist) and Dr. Hangan (the neurologist who examined Plaintiff and evaluated his NCS/EMG results) made findings that could support Dr. Bastos' assessment. (R. 324-25; 294-95). The specialists' findings included that Plaintiff had an antalgic gait with some instability in certain stances; pain on palpation in his feet; problems with his deep tendon reflexes and patellar tendon

_____

18  The ALJ mistakenly wrote "neuropathy" instead of "nephropathy" in this section of the opinion, and Plaintiff notes that the typographical error causes confusion. (Doc. 17, at 10). But it is clear the ALJ meant to write nephropathy (which means kidney disease) given that nephropathy was Dr. Bastos' diagnosis and the ALJ wrote there was no evidence of "kidney problems." (R. 25).

reflexes; muscle weakness; abnormal results from his Doppler examination; decreased sensation in his lower extremities to light touch, pin prick and vibration; and decreased proprioception below the knees. (*Id.*). Since Dr. Bastos' notes showing he relied on these findings were admittedly not considered by the ALJ, it is unclear how those notes might have affected the ALJ's assessment.

It is also not clear whether the ALJ would have found Dr. Bastos' opinion vague and conclusory had she examined the underlying notes showing the basis for his assessment. Citing *Schaaf v. Astrue*, 602 F.3d 869 (7th Cir. 2010), the Commissioner argues that the ALJ reasonably found Dr. Bastos' opinion was vague and conclusory because the doctor did not explain his opinion and "his treatment notes do not clarify the doctor's reasoning." *Id.* at 875. But in *Schaaf*, the ALJ explicitly considered the treating physician's notes and found that they "did not fill in the gap" between the physician's opinion and the basis for that opinion. *Id.* at 873-74 (only support for opinion that claimant would miss a week or more of work per month was assessment in notes of chronic fatigue and insomnia, which ALJ determined did not provide a sufficient medical basis for the limitation). Here, rather than any express consideration of Dr. Bastos' notes, the ALJ explicitly did not review the doctor's treatment records, which contained references to examination findings, Plaintiff's complaints, and diagnostic test results. On remand, the ALJ might or might not find the notes provide the necessary explication for Dr. Bastos' opinion. In either event, this determination is for the ALJ to make, rather than this Court.

The Commissioner argues that the ALJ reasonably rejected Dr. Bastos' opinion that Plaintiff was unable to work full time in favor of Dr. Jimenez's contrary opinion,

because the "resolution of competing arguments based on the record is for the ALJ." (Doc. 19, at 6 (quoting *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002)).   But, as discussed above, the ALJ made the choice to accept the non-examining physician's opinion over the treating physician's opinion without ever considering the treating physician's records and explaining her findings based on those records.    The Commissioner cannot rely on the ALJ's acceptance of Dr. Jimenez's opinion alone as sufficient grounds for the ALJ's rejection of Dr. Bastos' opinion.    *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.") (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)).

Two other reasons offered by the Commissioner in support of the ALJ's treatment of Dr. Bastos' opinion require some brief attention.   First, the Commissioner argues that the ALJ reasonably found that Dr. Bastos failed to provide any "analysis" to support his opinion.   (Doc. 19, at 4).   However, the ALJ specifically stated that the record was "void of any function-by-function analysis provided by Dr. Bastos."   (R. 25). "[B]ecause the regulations do not require treating physicians or ALJs to provide a function-by-function analysis of a claimant's abilities[,] . . . the ALJ should not have relied on the lack of a function-by-function analysis as a factor in discounting" Dr. Bastos' opinion.  *Nash v. Colvin*, No. 12 C 6225, 2013 WL 5753796, at *12 (N.D. Ill. Oct. 23, 2013) (citing *Knox v. Astrue,* 327 Fed. Appx. 652, 657 (7th Cir. 2009)).

Second, the Commissioner also argues that the ALJ correctly determined that Dr. Bastos' opinion was inconsistent with the medical evidence in the record.   (Doc. 19, at

4).  In support, the Commissioner states that Dr. Bastos' March 28, 2011 examination notes indicated that Plaintiff was not in pain, but he still assessed Plaintiff with severe pain.  (*Id.*).   The ALJ, however, did not rely on this reasoning since, as the Commissioner admits, the ALJ never reviewed Dr. Bastos' notes.  Therefore, the Court disregards this argument.  *See, e.g.*, *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)).  Moreover, the Commissioner's argument is also factually incorrect.   Although Dr. Bastos checked the "no" box on his form in response to a question about whether Plaintiff was reporting pain, he also noted that Plaintiff's "baseline leg weakness and pain mildly worsened," implying that he and Plaintiff did discuss some kind of ongoing pain at that examination.  (R. 268).  As a result of the foregoing, neither of these arguments provides sufficient support to uphold the ALJ's treatment of Dr. Bastos' opinion.

For all the reasons discussed above, the ALJ failed to appropriately consider Dr. Bastos' March 28, 2011 opinion, and this is a sufficient ground for remanding the case for further consideration.[19]

## 2.    Credibility Assessment

Plaintiff also argues that the ALJ erred in assessing his credibility.  Specifically, Plaintiff challenges the ALJ's decision to discount his complaints of fatigue, difficulty standing and walking based on vagueness and lack of supporting medical evidence,

_____

19  It is worth noting that Dr. Bastos did not begin treating Plaintiff until more than a year after the date last insured of September 30, 2009.  Thus it appears that his opinion and treatment notes may be relevant only to the SSI claim but not the DIB claim.

and for drawing inferences based on Plaintiff's non-compliance with his treatment regimen for his diabetes and high cholesterol. (Doc. 17, at 13-14; Doc. 20, at 4-6). In assessing a claimant's credibility, the ALJ is required to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). *See also* 20 C.F.R. § 404.1529(c). The ALJ's credibility determination must "contain specific reasons for the finding on credibility, supported by the evidence in the case record." *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013) (quoting SSR 96–7p, 1996 WL 374186 at *4). The credibility determination will be overturned only if "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013).

In this case, the ALJ provided a thorough discussion of the reasons supporting her credibility determination based on her review of the medical evidence in the record, Plaintiff's statements, and the statements of certain treaters. That said, Plaintiff has identified certain issues surrounding the credibility determination that the ALJ should address on remand. First, the ALJ drew a negative inference regarding Plaintiff's credibility from his lack of compliance with the recommended diabetes and cholesterol treatments, but neither questioned him regarding the reasons for non-compliance nor discussed them in the opinion. The ALJ should not "draw any inferences" about the claimant's condition from the failure to follow a treatment plan without exploring the

claimant's explanations for the lack of compliance. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (quoting SSR 96-7p, 1996 WL 374186, at *7).

Second, the ALJ stated that the record contains no evidence that Plaintiff's neuropathy could affect his ability to stand or walk, other than the mild findings in Plaintiff's NCS/EMG and Dr. Carlton's findings of Plaintiff's altered sensation to light touch in both feet. (R. 24). Since the ALJ was unaware of treatment by Dr. Bastos, upon remand, the ALJ should consider any relevant findings in Dr. Bastos' notes or the reports he reviewed (including the aforementioned reports by Drs. Metz and Hangan). The ALJ should also correct her misstatement that Dr. Metz, a podiatrist, "ruled out" Plaintiff for neuromuscular disease symptoms on February 10, 2011. According to the records, Dr. Metz found Plaintiff had an antalgic gait with some instability in certain stances; pain on palpation in his feet; problems with his deep tendon reflexes and patellar tendon reflexes; muscle weakness; and abnormal results from his Doppler examination. (R. 324-25). Dr. Metz then recommended Plaintiff undergo a NCS/EMG to further determine whether he had any neuromuscular diseases (and, as the ALJ acknowledged, the March 18, 2011 NCS/EMG showed Plaintiff had mild peripheral polyneuropathy of both lower extremities). (R. 294-95; 325).

Finally, the ALJ may wish to discuss her consideration of Dr. Carlton's other findings related to Plaintiff's problems with walking (including the doctor's findings that Plaintiff's proprioception of both feet was impaired; that he displayed a rigid gait; and that he displayed moderate difficulty with tandem walking, severe difficulty walking on his toes and an inability to walk on his toes or his heels or to hop on one leg). (R. 203-06).

Clarifying the foregoing credibility findings may not ultimately change the ALJ's determination regarding Plaintiff's credibility given all the other reasons she provided for questioning Plaintiff's credibility. Nonetheless, since the case is being remanded, the ALJ should clarify the credibility findings by addressing the issues raised above.[20]

## CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Summary Judgment (Doc. 18) is denied and Plaintiff's Motion for Summary Judgment (Doc. 17) is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: May 14, 2014

*Sheila Finnegan*

SHEILA FINNEGAN
United States Magistrate Judge

---

[20] In his statement of the issues at the beginning of the opening brief, Plaintiff also states that the ALJ erred by failing to discuss his activities of daily living in evaluating his credibility. (Doc. 17, at 1). However, this argument is not presented with any legal authority or otherwise developed anywhere in the remainder of that brief. As a result, the argument is waived. *See Tomao v. Abbott Labs., Inc.,* No. 04 C 3470, 2007 WL 141909, at *1 (N.D. Ill. Jan. 16, 2007) ("This circuit has repeatedly warned litigants that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (quoting *United States v. Wimberly*, 60 F.3d 281, 287 (7th Cir.1995)).